# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**GLOBAL INFRASTRUCTURE FINANCE AND DEVELOPMENT AUTHORITY INC.,**

      Plaintiff,

v.

**CUSIP GLOBAL SERVICES and FACTSET RESEARCH SYSTEMS INC.,**

      Defendants,

**Civil Action No. _____**

FILED
HARRISBURG, PA

FEB 27 2026

PER _____
DEPUTY CLERK

## COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DECLARATORY JUDGMENT

Plaintiff Global Infrastructure Finance and Development Authority Inc. (hereinafter "GIFDA" or "Plaintiff"), by and through its undersigned counsel, brings this Complaint against Defendants CUSIP Global Services (hereinafter "CGS") and FactSet Research Systems Inc. (hereinafter "FactSet") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTORY STATEMENT

1.     This action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization and the willful maintenance of monopoly power through exclusionary conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

2.     The relevant market is the market for securities identification numbers required for access to U.S. capital markets. This market has a single supplier: Defendant CUSIP Global Services, operated by Defendant FactSet Research Systems Inc. There is no competing provider. There is no substitute product. There is no alternative pathway by which an issuer can obtain the identifier required by the Depository Trust Company ("DTC"), the Securities and Exchange Commission, the Municipal Securities Rulemaking Board ("MSRB"), and the entirety of U.S. clearing and settlement infrastructure.

3.     The CUSIP system meets the legal standard for an essential facility: it is controlled by a monopolist; market participants cannot practically or reasonably duplicate it; access has been denied to Plaintiff; and it is feasible to provide access. See *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983). The Investment Adviser Association, representing advisers managing over $35 trillion in assets, has formally determined that financial instrument identifiers "function as a public utility" and that "no gatekeeper should be allowed to have unfettered control over that access."

4.    Defendants' market position satisfies the legal standard for monopoly power: "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. Defendants hold 100% of the relevant market. No issuer can access U.S. capital markets without a CUSIP. The DTC's Operational Arrangements formally mandate that an "issuer or Agent must obtain a CUSIP number from the CUSIP Service Bureau for each of its issues." SEC regulations incorporate CUSIP numbers in at least 24 reporting requirements. MSRB Rule G-34 requires CUSIP assignment for municipal securities.

5.    The barriers to entry are insurmountable. The IAA has confirmed that CUSIP's "wide adoption by regulators, self-regulatory organizations, clearinghouses, exchanges, and brokerage firms" has allowed it to "become entrenched in the marketplace" and that replacing it "would be massively disruptive." Even the federal government's transition to an alternative identifier under the Financial Data Transparency Act (Pub. L. No. 117-263), backed by nine agencies and Congressional mandate, faces substantial resistance. A market participant cannot reasonably duplicate what the federal government struggles to replace.

6.    In *Dinosaur Financial Group LLC v. CUSIP Global Services*, No. 1:22-cv-01860 (S.D.N.Y.), Judge Failla denied defendants' motion to dismiss, ruling that the

complaint "sufficiently pleaded violations of Section 2 of the Sherman Act" and that CGS's licensing regime has allowed it to extract "monopoly rents disguised as 'license fees.'"

7.    Against this market structure, Defendants engaged in conduct that satisfies the legal standard for an unlawful refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985): the termination of a voluntary course of dealing without legitimate business justification.

8.    Between May 17, 2022 and September 16, 2022, Defendants accepted seven separate CUSIP requests from Plaintiff. Defendants formally assigned at least three CUSIPs (37961UAA0, 37961Y AA2, and 37961Y AE4). Defendants accepted final documentation through their document attachment portal. Defendants received bond counsel's confirmation of legal compliance. On September 27, 2024, Defendants confirmed by telephone that Plaintiff's file remained active for $34 billion. One of those assigned CUSIPs (37961Y AE4) was successfully published on DTC, FINRA, and the SEC, with full DTC eligibility, and loaded into the Bloomberg Professional Terminal.2

9.    Then, on July 30, 2025, nearly four years after the first request, Defendants reversed course and rejected Plaintiff's application for the first time, claiming the bonds constitute a "private issue" and that "a CUSIP is not needed for a private sale

of bonds." This was the first time Defendants articulated any specific basis for refusal.3

10. The stated justification is contradicted by Defendants' own practices. Defendants routinely assign Private Placement Note ("PPN") identifiers to non-public instruments. Defendants' own November 2025 CUSIP Issuance Trends report documents that Defendants issued 564 PPN identifiers in November 2025 alone, with 4,982 PPN identifiers issued year-to-date, representing a 16.7% year-over-year increase.4 Defendants' assertion that "a CUSIP is not needed for a private sale of bonds" is inconsistent with Defendants' own dedicated Private Placement Number product line.

11. The factual parallel *to Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), is direct. In *Otter Tail*, the Supreme Court held that a private utility's refusal to provide transmission access to municipalities seeking to establish their own power systems violated Section 2, because the refusal "was solely to prevent municipal power systems from eroding its monopolistic position" and had no legitimate business justification. Id. at 377-78. The Court found no technical barrier to providing access; the refusal was "one of will," not of capacity. Id. at 375.

12. Here, Defendants control the sole infrastructure required for a government-authorized function: CUSIP issuance to enable capital market access for state-

authorized infrastructure finance. Defendants have already assigned three CUSIPs to Plaintiff and confirmed the file was active. There is no technical barrier to providing access. The obstruction is one of will, not capacity.

13. Plaintiff is a 501(c)(3) nonprofit corporation authorized by the legislatures of Alabama, Georgia, and Pennsylvania to finance critical infrastructure projects, including a deepwater port, a 357-mile toll road, and 400 miles of high-speed rail, expected to create over 325,000 jobs. Under the Revenue Ruling 63-20 framework recognized by the IRS and the Federal Highway Administration, Plaintiff functions as a nonprofit corporation issuing bonds "on behalf of" state political subdivisions. Alabama's joint resolutions confirm that upon bond retirement, "all rights, title, and interest in the projects will vest in the State of Alabama."5

14. Defendants' conduct satisfies the elements of unlawful monopolization, refusal to deal, and denial of access to an essential facility. Defendants' conduct has caused, and continues to cause, antitrust injury of the type the antitrust laws were designed to prevent.

## **PARTIES**

15. Plaintiff Global Infrastructure Finance and Development Authority Inc. ("GIFDA") is a nonprofit corporation duly established under entity number 4364375, recognized as a 501(c)(3) entity under the Internal Revenue Code of 1986,

formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 2575 Eastern Blvd, Suite 105, York, Pennsylvania 17402. GIFDA functions as a non-profit economic development entity with a focus on financing, acquiring, constructing, operating, managing, and maintaining significant infrastructure projects, including high-speed rail systems, rail corridors, underground tunneling, shipping vessels, airport construction, highway systems, and various transportation services. GIFDA is a member of the American Bankers Association (ABA ID # 00815300).

16.   Defendant CUSIP Global Services ("CGS") is a business unit that operates the CUSIP system, the sole mechanism for assigning securities identification numbers required for trading and settlement in U.S. capital markets. CGS was originally operated by Standard & Poor's, a division of S&P Global. In 2022, the European Commission required S&P Global to divest CGS as a mandatory condition of its $44 billion merger with IHS Markit. FactSet acquired the CUSIP business for $1.925 billion. CGS operates under an exclusive license from the American Bankers Association dating to 1968.

17.   Defendant FactSet Research Systems Inc. ("FactSet") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Norwalk, Connecticut. FactSet is a publicly traded company (NYSE:

FDS). FactSet operates CGS as a wholly-owned business unit and is responsible for CGS's operations, policies, and conduct, including the CUSIP issuance decisions at issue in this action.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

18.    This Court has original jurisdiction over Plaintiff's claims arising under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

19.    This Court has jurisdiction over Plaintiff's claims for injunctive relief and treble damages under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts as Plaintiff's federal antitrust claims.

21.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiff is a Pennsylvania citizen. Defendant FactSet is a citizen of Delaware and Connecticut. Defendant CGS is a business unit of FactSet and shares its citizenship. Complete diversity exists between the parties. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## *Personal Jurisdiction*

22.    Defendants are subject to personal jurisdiction in this District. Defendants have purposefully directed their activities at the Commonwealth of Pennsylvania and this District, and Plaintiff's claims arise directly from those activities.

23.    CGS has transacted substantial and continuous business within the Middle District of Pennsylvania by processing CUSIP identifier requests for securities issuers located in this District. CGS's own November 2025 CUSIP Issuance Trends report confirms that CGS processed 56 municipal CUSIP requests in Pennsylvania in that month alone. On information and belief, CGS processes CUSIP requests from issuers in the Middle District of Pennsylvania on a regular and ongoing basis.

24.    CGS directed seven CUSIP confirmations and at least two formal CUSIP assignments to Plaintiff at its principal place of business at 2575 Eastern Blvd, Suite 105, York, Pennsylvania 17402, which is within this District. The formal CUSIP confirmation for CUSIP 37961UAA0, signed by Gerard Faulkner, Director Operations, CGS, was addressed to "SHAH MATHIAS GLOBAL INFRASTRUCTURE FINANCE 2575 EASTERN BLVD #105 YORK, PA 17402-2903." CGS's "CUSIP Data Integrity Publication" communications were likewise directed to Plaintiff's Chairman at the same address.

25.    CGS accepted and processed Plaintiff's CUSIP applications, which were submitted from this District. CGS accepted final documentation from Plaintiff through the CGS document attachment portal, confirmed that documentation was "successfully submitted," and thereafter confirmed that Plaintiff's CUSIP file remained active, all while knowing Plaintiff was located in this District.

26.    Defendants' tortious conduct, including the refusal to activate CUSIP identifiers and the July 30, 2025 rejection of Plaintiff's application, was directed at Plaintiff in this District and has caused ongoing injury to Plaintiff in this District, where Plaintiff maintains its principal place of business and conducts its operations.

27.    FactSet, as the parent and operator of CGS, conducts business throughout the United States, including Pennsylvania. FactSet is a publicly traded financial data and analytics company that provides products and services to financial professionals in this District. FactSet is responsible for CGS's operations and exercises control over CGS's CUSIP issuance policies and decisions.

28.    The exercise of jurisdiction over Defendants is consistent with due process. Defendants have purposefully availed themselves of the privilege of conducting business in this District by operating a nationwide CUSIP issuance system, processing numerous CUSIP applications from Pennsylvania issuers (including issuers in this District), directing formal CUSIP assignments and communications

to Plaintiff in this District, and engaging in a multi-year course of dealing with Plaintiff located in this District. Plaintiff's claims arise directly from these contacts.

## Venue

29.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including CGS's direction of CUSIP confirmations and assignments to Plaintiff in York, Pennsylvania, CGS's acceptance of Plaintiff's applications submitted from this District, and the harm suffered by Plaintiff at its principal place of business in this District.

30.    Venue is also proper under 15 U.S.C. § 22 (the Clayton Act's special venue provision) because Defendants transact business in this District.

## FACTUAL ALLEGATIONS

### A. The CUSIP System and Defendants' Monopoly

31.    The CUSIP (Committee on Uniform Securities Identification Procedures) system was established in 1964 to standardize the identification of securities in the United States. Each CUSIP is a nine-character alphanumeric identifier assigned to a security. CUSIP numbers are used for clearing, settlement, and trading of securities in U.S. markets.

32.     CUSIP numbers are a mandatory prerequisite for participation in U.S. capital markets:

a.     The Depository Trust Company ("DTC"), which settles virtually all securities transactions in the United States, mandates in its Operational Arrangements that "[i]ssuer or Agent must obtain a CUSIP number from the CUSIP Service Bureau for each of its issues." Securities that lack a CUSIP cannot enter DTC's system and cannot be cleared, settled, or held by institutional investors.

b.     Broker-dealers, custodians, and financial institutions require CUSIP numbers to process transactions.

c.     SEC regulations and reporting requirements are built around the CUSIP system. Bloomberg L.P. has documented that CUSIP appears in at least 24 instances in the SEC's rulebook in connection with reporting requirements or mandatory forms.

d.     Trading platforms and exchanges require CUSIPs for securities to be listed and traded.

e.     No institutional investor will commit capital to a U.S. security lacking an activated CUSIP.

33.    CGS is the sole provider of CUSIP numbers in the United States. There is no alternative provider. Defendants hold 100% market share in the relevant market for securities identification numbers required for U.S. capital market access.

34.    The barriers to entry in the CUSIP market are insurmountable. Federal regulations mandate the use of CUSIP identifiers across at least 24 SEC reporting requirements. MSRB Rule G-34 requires CUSIP assignment for municipal securities. DTC mandates CUSIP numbers for eligibility. The Investment Adviser Association ("IAA"), representing advisers managing over $35 trillion in assets, has confirmed that replacing CUSIP "would be massively disruptive" with "enormous costs," and that "most end users that have relied on CUSIP for a variety of purposes would want to continue to do so." Even the federal government's effort to transition to the open-source FIGI identifier under the Financial Data Transparency Act, backed by nine agencies and Congressional mandate, is proceeding slowly against resistance from the ABA, which owns the CUSIP system.

35.    The CUSIP monopoly has been recognized by courts, regulators, and the federal government:

    a.    In Dinosaur Financial Group LLC v. CUSIP Global Services, No. 1:22-cv-01860 (S.D.N.Y.), Judge Failla denied defendants' motion to dismiss, ruling that the complaint "sufficiently pleaded violations of Section 2 of the

Sherman Act" and that CGS's licensing regime has allowed it to extract "monopoly rents disguised as 'license fees.'"

b.      In 2009, the European Commission initiated formal antitrust proceedings against S&P (then operator of CGS) for abusing its dominant position, finding that S&P "enjoys a monopoly for the issuance and the first-hand distribution of ISINs." In 2011, the Commission made legally binding S&P's commitments to abolish unfair licensing fees.

c.      In 2014, SEC Commissioner Daniel M. Gallagher publicly stated: "I would be remiss if I didn't point out that the Commission needs to do something about the de facto monopoly forcing the use of CUSIPs in the fixed income markets."

d.      In 2022, the European Commission required S&P to divest CGS as a mandatory condition of its merger with IHS Markit, finding the divestiture was necessary to "bring about a lasting structural change in the market."

e.      In October 2024, the IAA wrote to all nine federal financial regulators, stating that financial instrument identifiers "function as a public utility" and that "no gatekeeper should be allowed to have unfettered control over that

access." The IAA warned that "CGS has no accountability or regulatory oversight."

 f. Nine federal agencies have proposed transitioning to the open-source FIGI identifier under the Financial Data Transparency Act (Pub. L. No. 117-263, §§ 5811-5826), recognizing the CUSIP monopoly as a systemic problem requiring regulatory intervention.

36. No federal or state regulatory agency exercises oversight over CGS's issuance decisions. The IAA has confirmed that "CGS has no accountability or regulatory oversight." There is no administrative remedy, no appeal process, and no regulator to which a party denied a CUSIP can turn.

**B. Plaintiff's State-Authorized Securities**

37. Plaintiff's infrastructure financing activities are authorized by the legislatures of multiple sovereign states:

 a. Alabama: SJR 56 and HJR 459 "clearly authorize the issuance of 'Revenue Bonds' secured by toll revenues, aligning with the requirements of Rule 131 and Section 3(a)(2) of [the Securities Act of] 1933." Upon bond retirement, "all rights, title, and interest in the projects will vest in the State of Alabama."

b.      Georgia: House Resolutions 872 and 948 "acknowledge the expansion of high-speed rail, creating a direct tie-in to the Alabama Corridor projects."

c.      Pennsylvania: Dauphin County FACTS Resolution 74461933 "summarizes a financing plan for interstate commerce infrastructure projects using revenue bonds."

d.      The bond programs are aligned with the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58), the Bipartisan Infrastructure Law.

38.     Under the Revenue Ruling 63-20 framework recognized by the IRS and the Federal Highway Administration, GIFDA functions as a nonprofit corporation issuing bonds "on behalf of" state political subdivisions. The state retains a beneficial interest in the financed assets while indebtedness remains outstanding, and upon bond retirement, the state obtains full legal title.

39.     Plaintiff's bonds are corporate government bonds, a classification confirmed by the MSRB and by CGS itself. The bonds comply with Rule 131 and Section 3(a)(2) of the Securities Act of 1933 and are not subject to MSRB registration and publication.

**C. Plaintiff's Bond Programs**

40.    GIFDA's bond programs are governed by a Master Trust Indenture dated July 10, 2022 (ref. MONTLIB-209190), as supplemented and amended by the Trust Indenture dated August 1, 2025. Each Series of Bonds is "a special and direct obligation of the Issuer" secured by Pledged Revenues through a first lien valid and binding against all parties.

41.    The bond programs encompass multiple series totaling over $100 billion in authorized infrastructure financing, including:

a.    GIFDA-ATL Program ($40 Billion): Fixed-rate, semi-annual coupon corporate government bonds maturing July 29, 2052, with an AA+ estimated credit rating and 2.35% issue yield. Assigned CUSIP 37961UAB8, ISIN UF37961UAB89, and entered into the Bloomberg Professional Terminal on October 12, 2022.

b.    GIFDA-MAL Program ($60 Billion): Fixed-rate, semi-annual coupon corporate government bonds maturing June 30, 2052, with an AA+ estimated credit rating and 2.35% issue yield. Assigned CUSIP 37961UAA0, ISIN US37961UAA07. CGS formally confirmed this assignment on August 12, 2022, signed by Gerard Faulkner, Director Operations, CGS.

c.       Additional series including the HSR Freight/Passenger Series ($34 billion), the Atlantic Energy Series ($40 billion), and the HSR Passenger Services Series ($25 billion).

42.    GIFDA's bond programs are supported by institutional-grade professional service providers, including Argent Institutional Trust Co. (Bond Trustee and Paying Agent), Securities Transfer Corporation (Bond Transfer Agent), KPMG (Auditor), Resnick & Louis, P.C. (Tax Reporting Counsel), First Boston Global Custody and Trust Company (Underwriter and Placement Manager), Morgan Stanley (Broker of Record), Estates and Infrastructure Exchange Limited (Bond Listing Agent), and Messers Law Group Pllc (Bond Counsel).

**D. Plaintiff's Course of Dealing with CGS and Defendants' Reversal**

43.    Between May 17, 2022 and September 16, 2022, Plaintiff's Founder and Chairman, Shah Mathias, personally submitted seven CUSIP requests to CGS. Each was confirmed by CGS as "submitted successfully." CGS approved four of the seven requests for public dissemination across its products and services.

44.    CGS went beyond merely accepting requests. It formally assigned at least three CUSIPs to Plaintiff:

a.    August 12, 2022: CUSIP 37961UAA0 / ISIN US37961UAA07 for REV BD SER 2022, maturity 06/30/2052. CGS accepted final documentation through its document attachment portal. On August 12, 2022, CGS's Quality Manager, Vinny DeCarluccio, sent a further "CUSIP Data Integrity Publication" communication confirming the assignment.

b.    September 16, 2022: CUSIP 37961Y AA2 / ISIN US37961YAA29 for REV BD SER 2022, maturity 06/30/2042. Classified as a "Corporate" CUSIP. Signed by Gerard Faulkner, Director Operations, CGS.

c.    CUSIP 37961Y AE4: Assigned by CGS to GIFDA and, as of October 16, 2024, "fully published and available on DTC, FINRA and SEC with DTC eligibility." Mohammad F. Khan, Chairman of GIFDA's Investment Board, personally "successfully loaded the files in Bloomberg" for this CUSIP.

45.    On August 26, 2022, Torben M. Welch of Messner Reeves LLP, acting as bond counsel, wrote directly to CGS confirming that: "(a) the respective sponsor, issuer, trustee and borrower under the Bond is duly qualified to transact business"; "(b) the Opinion Documents are legal and valid documents and materially comply with the legal requirements necessary for issuance of CUSIP/ISIN numbers from CGS"; and "(c) upon issuance of such CUSIP/ISIN numbers the Bond shall be placed on the Bloomberg E-Bond System." Bond counsel concluded: "Given the foregoing,

we are of the opinion that CGS is in the position to authorize the CUSIP/ISIN number for the Bond in reliance on the foregoing."

46.     On December 11, 2024, Christopher L. Murphy, Esq. communicated with the MSRB, whose senior technical team confirmed that "the proper option for CUSIP issuance with reference to GIFDA Inc. is the Corporate Government Debt option," which is "the same option which [CGS] proposed."

47.     On September 27, 2024, Chairman Mathias personally telephoned CGS to inquire about the status of GIFDA's CUSIP file. During that call, CGS confirmed that the file for CUSIP 37961Y AA2 remained active for $34 billion. CGS did not indicate any deficiency, problem, or outstanding requirement.

48.     Between December 2024 and February 2025, Plaintiff made three formal written requests to CGS:

a.     December 11, 2024: Christopher L. Murphy, Esq. wrote to CGS confirming the MSRB classification, Securities Act compliance, and formally requesting issuance.

b.     January 24, 2025: CEO Robert Choiniere personally wrote to Gerard Faulkner at CGS, detailing the public benefits of the projects and requesting prompt action.

c.  February 20, 2025: Chairman Mathias wrote to CGS, escalating to Theresa Dempsey (Director, CUSIP Customer Support) and Scott Preiss (Senior Vice President and Global Head of CGS), noting that GIFDA had modified its ticket size based on CGS's own recommendations.

49  .On February 2, 2025, Chairman Mathias communicated with Joanne Horn at the U.S. House of Representatives regarding CGS's obstruction, attaching a formal letter explaining GIFDA's situation.

50.  On July 30, 2025, a conference call was held between GIFDA's representatives and CGS leadership. Scott J. Preiss, Senior Vice President and Global Head of CGS, "expressed reservations regarding the classification" of GIFDA's bonds. CGS rejected GIFDA's application on the grounds that the bonds constitute "a 'private issue'" and stated that "a CUSIP is not needed for a private sale of bonds." This was the first time in nearly four years that CGS articulated a specific basis for its refusal.

51.  On August 20, 2025, Todd A. White of Rulon & White Governance Strategies submitted a comprehensive memorandum to Scott Preiss requesting that CGS "reconsider and overturn" the rejection. The memorandum rebutted CGS's "private issue" justification on five independent grounds, and GIFDA offered to retitle its "Private Placement Memorandum" as a "Memorandum of Offering" to address any

nomenclature concerns. To Plaintiff's knowledge, CGS did not respond substantively to this memorandum.

**E. CGS's "Private Issue" Justification Is Pretextual**

52.    CGS's stated justification is contradicted by the following undisputed facts:

a.    CGS accepted seven CUSIP requests from GIFDA and approved four for public dissemination.

b.    CGS formally assigned at least three CUSIPs (37961UAA0, 37961Y AA2, and 37961Y AE4) and accepted final documentation.

c.    CGS confirmed the file was active as of September 2024, with no deficiency noted.

d.    CGS routinely assigns CUSIPs to private placements via its PPN process. CGS's own November 2025 Issuance Trends report documents that CGS issued 564 PPN identifiers in November 2025 alone, with 4,982 PPN identifiers issued year-to-date, representing a 16.7% year-over-year increase. CGS cannot credibly claim that "a CUSIP is not needed for a private sale" while simultaneously operating a dedicated PPN product line that processes thousands of such identifiers each year.

e.     The MSRB confirmed the proper classification, which is the same classification CGS itself proposed.

f.     Bond counsel confirmed legal compliance directly to CGS.

g.     GIFDA offered to retitle its documentation, and CGS did not respond.

h.     One of CGS's own assigned CUSIPs (37961Y AE4) was fully published on DTC, FINRA, and the SEC with DTC eligibility, demonstrating that the process works when CGS permits it.

i.     GIFDA modified its ticket size based on CGS's own feedback, and CGS still refused.

## F. Disparate Treatment of Similarly Situated Issuers

53.     During the same period that Defendants refused to activate CUSIPs for GIFDA, Defendants issued or confirmed CUSIP identifiers to other issuers without obstruction or delay. CGS routinely assigns identifiers to municipal bonds issued by 501(c)(3) nonprofits in sectors such as education and healthcare, assigns PPN identifiers to non-public instruments, and issues CUSIPs to qualified 501(c)(3) bonds under Section 145 of the Internal Revenue Code for infrastructure, hospital, and university finance.

54.    CGS's own November 2025 Issuance Trends report confirms the scale and regularity of this activity. In November 2025 alone, CGS processed 8,572 corporate CUSIP requests, 1,191 municipal CUSIP requests, 775 international CUSIP requests, 564 Private Placement Number requests, and 287 syndicated loan facility requests. In the three states whose legislatures have authorized GIFDA's projects, CGS processed municipal CUSIP requests without apparent difficulty: Alabama (9 requests), Georgia (17 requests), and Pennsylvania (56 requests).

55.    CGS's pattern of obstruction extends beyond GIFDA. On April 12, 2025, Chairman Mathias submitted CUSIP Request No. 0412553973 for bonds issued by EnerTech Holding Company on behalf of the Kingdom of Kuwait. CGS confirmed the request was "submitted successfully" and the identifiers "WILL be disseminated." Despite this confirmation, by August 18, 2025, CGS had gone silent, failing to issue the requested CUSIPs or respond to follow-up inquiries.

56.    There is no legitimate basis to distinguish Plaintiff's securities from those of issuers who received CUSIPs without difficulty. GIFDA's bonds are conventional, fixed-rate instruments issued by a 501(c)(3) nonprofit, authorized by state legislation, investment-grade, aligned with the Bipartisan Infrastructure Law, secured by pledged revenues, and governed by a professionally administered trust indenture.

### G. Mitigation Efforts and Inadequacy of Alternatives

57.    In an effort to mitigate the harm caused by Defendants' refusal, Plaintiff obtained International Securities Identification Numbers ("ISINs") for its securities through alternative channels. ISINs are insufficient for U.S. market access. The DTC, broker-dealers, custodians, and other U.S. market participants require CUSIP numbers. An ISIN without a corresponding activated CUSIP cannot be settled or traded in U.S. markets.

58.    Bloomberg L.P. confirmed this structural reality in its February 2025 letter to the SEC, acknowledging that even though the open-source FIGI identifier has been mapped 276 billion times and is used by over 1,200 organizations, CUSIP's dominance persists because it is "government mandated." Until the FDTA transition occurs, no alternative identifier can substitute for a CUSIP in U.S. capital markets.

### H. Harm to Plaintiff

59.    Defendants' obstruction has effectively locked Plaintiff out of U.S. capital markets for nearly four years. The CUSIP obstruction has prevented GIFDA from funding:

   a.    Mobile Alabama Deepwater Port ($60 billion): Expected to create over 250,000 direct jobs, provide cargo access to 50 million consumers, and serve as a Panama Canal hub.

b.      ATFI Toll Road ($40 billion): A 357-mile private toll road in Alabama, expected to generate 75,000+ ancillary jobs.

c.      High-Speed Rail: 400 miles from Atlanta, Georgia to Alabama.

d.      Additional projects across California, Pennsylvania, and Georgia.

In total, GIFDA's projects are expected to create over 325,000 direct and ancillary jobs.

60.    Without exception, institutional investors have indicated that they cannot invest in securities lacking activated CUSIP identifiers because their custodians require CUSIPs to hold securities, their internal compliance policies require CUSIPs for trade execution, they cannot settle trades through DTC without CUSIPs, and securities without activated CUSIPs are effectively illiquid.

61.    Investors who had expressed interest in Plaintiff's bond programs have withdrawn or declined to proceed as a direct result of the CUSIP obstruction. GIFDA's inability to complete financings has damaged its reputation despite assigned CUSIPs, Bloomberg recognition, an AA+ rating, multi-state legislative authorization, MSRB confirmation, and bond counsel opinions.

62.    The harm to Plaintiff is continuous and compounds with each passing day. Lost market access cannot be retroactively restored. Investor relationships are perishable and cannot be recovered. Reputational harm is ongoing and

immeasurable. Time-sensitive market windows, investor mandates, and rate environments that existed during the past four years cannot be reinstated.

## CLAIMS FOR RELIEF

### COUNT I: Monopolization (Sherman Act § 2, 15 U.S.C. § 2)

63.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

64.    The relevant market is the market for securities identification numbers required for access to U.S. capital markets.

65.    Defendants possess monopoly power in the relevant market as defined in *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966): 'the power to control prices or exclude competition.' Defendants hold 100% market share. A market share at or near 100% gives rise to a strong inference of monopoly power. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992).

66.    Defendants have willfully maintained their monopoly power through exclusionary conduct, including: (a) refusing to deal with Plaintiff without legitimate business justification; (b) arbitrarily denying Plaintiff access to an essential facility; (c) applying standards in a discriminatory manner; and (d) using their gatekeeper position to exclude a lawful market participant.

67.    Defendants' conduct has anticompetitive effects, including the exclusion of lawful securities from U.S. markets, harm to competition in downstream markets for infrastructure finance, and a chilling effect on market access by other issuers.

68.    Defendants have no legitimate business justification for their refusal.

69.    Plaintiff has suffered antitrust injury of the type the antitrust laws were designed to prevent, flowing directly from Defendants' anticompetitive conduct. Plaintiff is entitled to treble damages under 15 U.S.C. § 15.

## COUNT II: Attempted Monopolization (Sherman Act § 2, 15 U.S.C. § 2)

70.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71.    In the alternative, to the extent Defendants' conduct is characterized as an attempt to extend or maintain monopoly power, Defendants have: (a) engaged in predatory and anticompetitive conduct; (b) with specific intent to monopolize; and (c) with a dangerous probability of achieving or maintaining monopoly power in the relevant market.

## COUNT III: Refusal to Deal / Essential Facilities Doctrine

72.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

73.    The CUSIP system satisfies each element of the essential facilities doctrine as articulated in *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983):

(a) Control by a monopolist: Defendants hold 100% of the market for securities identification numbers required for U.S. capital market access. There is no competing provider.

(b) Inability to duplicate: The IAA has confirmed that replacing CUSIP "would be massively disruptive" with "enormous costs." Even the federal government's FDTA transition faces substantial resistance. Plaintiff cannot reasonably duplicate what the federal government struggles to replace.

(c) Denial of access: Defendants refused, for nearly four years, to activate CUSIP identifiers for Plaintiff's securities.

(d) Feasibility of providing access: Defendants processed over 11,000 identifier requests in November 2025 alone. Defendants have already assigned three CUSIPs to Plaintiff and confirmed the file was active. Processing Plaintiff's applications imposes no technical burden.

74.    Defendants' refusal to provide Plaintiff access to the CUSIP system constitutes an unlawful refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). Defendants terminated a voluntary course of dealing with Plaintiff, maintained over nearly four years, without legitimate business justification.

75.    The IAA has determined that financial instrument identifiers "function as a public utility" and that "no gatekeeper should be allowed to have unfettered control over that access." CGS occupies the same structural position in financial markets that Terminal Railroad occupied in rail transportation and that Otter Tail occupied in electric power: a private monopolist controlling bottleneck infrastructure required for a government-authorized function.

## COUNT IV: Tortious Interference with Prospective Business Relations

76.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

77.    Plaintiff had prospective business relationships with institutional investors, counterparties, and other market participants for the financing of its securities. These included relationships cultivated by Plaintiff's Investment Board Chairman, Mohammad F. Khan, and facilitated through First Boston Global Custody and Trust

Company (Underwriter and Placement Manager) and Morgan Stanley (Broker of Record).

78.    Defendants knew or should have known of these prospective relationships. Defendants were aware that GIFDA's bond programs were structured for placement with institutional investors, as confirmed by bond counsel's letter to CGS stating that upon CUSIP issuance, "the Bond shall be placed on the Bloomberg E-Bond System."

79.    Defendants intentionally interfered with these relationships by refusing to activate CUSIP identifiers, thereby preventing Plaintiff from completing its financings.

80.    Defendants' interference was improper because: (a) it was without legitimate justification; (b) it was accomplished through abuse of monopoly power over an essential facility; and (c) CGS's own prior conduct, including assigning three CUSIPs and confirming the file was active, demonstrates the absence of any good-faith basis for the refusal.

81.    Plaintiff suffered actual harm as a direct result of Defendants' interference, including lost financing opportunities, withdrawn investors, and reputational damage.

**COUNT V: Tortious Interference with Contract**

82.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

83.     Plaintiff had existing contractual relationships with institutional-grade professional service providers in connection with its bond programs, including Argent Institutional Trust Co. (Bond Trustee), Securities Transfer Corporation (Bond Transfer Agent), KPMG (Auditor), and First Boston Global Custody and Trust Company (Underwriter and Placement Manager), among others, as set forth in the Master Trust Indenture and supporting agreements.

84.     Defendants knew or should have known of these contractual relationships.

85.     Defendants intentionally interfered with Plaintiff's performance of these contracts by refusing to activate CUSIP identifiers, which are a prerequisite to the bond issuance and settlement process that these contracts were designed to facilitate.

86.     Defendants' interference caused disruption to and prevented performance of these contractual relationships, causing Plaintiff damages.

## COUNT VI: Breach of Implied Contract / Covenant of Good Faith and Fair Dealing

87.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

88.    By establishing an application process for CUSIP identifiers, inviting applications from issuers, accepting Plaintiff's seven applications, formally assigning at least three CUSIPs, accepting Plaintiff's final documentation, and confirming that Plaintiff's file was active, Defendants entered into an implied contract to process Plaintiff's applications in good faith and in accordance with their stated requirements and standard procedures.

89.    Plaintiff performed all conditions required of it under the application process, including submitting all required documentation, obtaining bond counsel confirmation of legal compliance, and modifying its ticket size based on CGS's own feedback.

90.    Defendants breached the implied contract by: (a) refusing to activate CUSIPs that Defendants themselves had assigned; (b) applying unstated and arbitrary requirements after years of accepting Plaintiff's submissions; (c) failing to provide legitimate reasons for denial until nearly four years after the initial application; and (d) failing to respond substantively to Plaintiff's comprehensive rebuttal of Defendants' stated justification.

91.    Plaintiff suffered damages as a direct and proximate result of Defendants' breach.

## COUNT VII: Declaratory Judgment (28 U.S.C. §§ 2201-2202)

92.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

93.     An actual controversy exists between Plaintiff and Defendants regarding: (a) Plaintiff's entitlement to CUSIP identifiers for its securities; (b) the lawfulness of Defendants' refusal; and (c) Defendants' obligations as the monopoly provider of essential market infrastructure.

94.     Plaintiff is entitled to a declaration that:

    a.     Plaintiff's securities are entitled to CUSIP identifiers;

    b.     Defendants' refusal to activate CUSIP identifiers for Plaintiff's securities is unlawful; and

    c.     Defendants must process Plaintiff's applications under the same standards, procedures, and timeframes applied to other issuers.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

I.   A preliminary injunction, pending resolution of this action, ordering Defendants to:

(a) cease their unlawful refusal to activate CUSIP identifiers for Plaintiff's securities; (b) process Plaintiff's pending CUSIP application(s) under the same standards applied to similarly situated issuers; and (c) refrain from further discriminatory or arbitrary treatment of Plaintiff.

II.   A permanent injunction on the same terms.

III.   A declaratory judgment that:

(a) Defendants' refusal to activate CUSIP identifiers for Plaintiff's securities is unlawful;

(b) Plaintiff's securities are entitled to CUSIP identifiers; and

(c) Defendants may not arbitrarily deny CUSIP identifiers to qualified applicants.

IV.   Actual damages in an amount to be proven at trial.

V.   Treble damages pursuant to 15 U.S.C. § 15.

VI.   Pre-judgment and post-judgment interest.

VII.   Reasonable attorneys' fees pursuant to 15 U.S.C. § 15.

VIII.   Costs of suit.

IX.   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 26, 2026

Respectfully submitted,

/s/ John W. Thompson

_____

John W. Thompson
PA I.D. No.: 15324
2575 Eastern BLVD STE 102
York PA 17402.
Phone 717 818 0268
Email: judgejwt@comcast.net

*Counsel for Plaintiff Global
Infrastructure Finance and
Development Authority Inc.*