2/12/26, 2:01 PM  SEC.gov | Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

Case 1:26-cv-00495-KMN  Document 1-7  Filed 02/27/26  Page 1 of 12



**U.S. Securities and Exchange Commission**

Home / Newsroom / Speeches and Statements / Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

SPEECH

# Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

## Commissioner Daniel M. Gallagher

Washington, D.C. | Sept. 16, 2014

Thank you Reena [Aggarwal] for inviting me to participate in today's conference and to Professor Sandeep Dahiya for your very kind introduction.

In recent months, some have questioned the fairness and, by extension, the quality of the U.S. stock markets. We've heard high-profile allegations that our equities markets are "rigged" from a particular author who I believe I don't need to name. That author has also argued that the "U.S. stock market [is] now a class system, rooted in speed, of haves and have-nots. The haves paid for nanoseconds; the have-nots had no idea that a nanosecond had value."[1]

It's true that technology today plays a far more critical role in the equities markets than ever. That technology, however, on the whole benefits investors far more than it harms them. In fact, investors are doing better in today's marketplace than they ever did when the trading was dominated by manual markets. Research and empirical data demonstrate a number of benefits arising from the introduction of new technology, including lower transaction costs, improved liquidity, greater market speed, more efficient price discovery, reduced volatility and increased market access.[2]

I am concerned, however, that the current market structure for *fixed income* products, which is marked by a troubling asymmetry of information, is far more likely to disadvantage retail investors. In the spirit of improving the quality of all of our financial markets, therefore, I

2/12/26, 2:01 PM  Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

Case 1:26-cv-00495-KMN  Document 1-7  Filed 02/27/26  Page 2 of 12

would like to take the opportunity this morning to discuss the need for analysis and reforms in both the equities and the fixed income markets.

Although the allegations of "broken" or "rigged" equities markets are overwrought, the fact is that the laws and rules the SEC uses to oversee those markets have failed to evolve to match their current operations. The regulations governing our equities markets are derived in large part from the authorities granted to, and mandates imposed upon, the Commission as part of the Securities Acts Amendments of 1975.[3] No one doubts that the equities markets of the 1970s are vastly different from the equities markets of today. In 1975, the New York Stock Exchange dominated the market; today, there are 11 exchanges which trade equities. Just as importantly, there also are more than 80 alternative trading systems registered with the SEC, over 40 of which trade equities.[4] On both exchanges and ATSs, the overwhelming majority of transactions are executed electronically. As I've noted in the past, today's equity markets are all but unrecognizable from those of 1975.[5]

It has been two years since I first stressed the need for the Commission to undertake a holistic review of our equity market structure.[6] Since that time, I am pleased to note, that I have been joined in this call by all of my fellow Commissioners.[7] In June, Chair White announced that the SEC would commence such a review and outlined several proposals, including some discrete, near-term initiatives.[8]

It is critically important that we begin the holistic review, in earnest, as soon as possible. Markets and market participants want and need clarity and, more importantly, investors deserve it. As we conduct our holistic review of equity market structure, we must not get mired down by any one-off issues, as so often happens in this type of situation. We need the Commission and its expert staff to reoccupy the market structure playing field.

In doing so we must not lose the proverbial forest for the trees. We need a comprehensive review of market structure as it exists today, with a particular focus on the laws and regulations that underlie that structure. We should not pursue, as the government so often does, the bureaucratically satisfying — yet intellectually lazy — approach of assuming that the markets and their participants are the source of any perceived problems. We need instead to acknowledge and review the role that regulation has played in creating those problems. As I've said before, there can and should be no sacred cows in our holistic review. [9]

In performing such a review, we should not limit ourselves to formulating recommendations for discrete amendments to existing rules or proposals for new rules. We should also conduct a global review of our rules, and the statutory framework, with the goal of eliminating regulatory overlap and redundancies, and providing a level playing field for markets and market participants. Part of the SEC's mission is to maintain *efficient* markets. Markets cannot operate with full efficiency, much less thrive, when they are choked by burdensome and dated regulation.

I'd like to focus today on three "big picture" items that our holistic equity market structure review should include: Regulation NMS, the self-regulatory organization model, and securities information processors — all parts of our regulatory landscape derived from the 1975 Amendments.

To begin, it is well past time to place Reg NMS under a microscope and analyze the underlying assumptions that led the Commission — in a contested 3-2 vote — to adopt it, as well as the unintended consequences that have arisen from its implementation. My predecessors Commissioners Glassman and Atkins dissented from the adoption of Reg NMS[10] because they did not believe that the Commission adhered to the goal of Congress to allow competitive forces,[11] rather than burdensome regulation, to guide the development of a national market system.[12]

Indeed, Commissioners Atkins and Glassman argued that the majority adopted Reg NMS based on unfounded assumptions about how the markets and investors should interact. Rather than allowing market forces to develop the national market system, they asserted, Reg NMS was a series of unnecessarily complex, non-market based rules.[13]

A prime example of one of the many elements of Reg NMS that should be subjected to a *de novo* review is the "trade-through" rule, which requires trading centers to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the execution of trades at prices inferior to protected quotations displayed by other trading centers.[14] In other words, rather than allowing markets to compete for order flow, the trade-through rule requires orders to be routed to an SRO that displays the national best bid or offer.

I believe that the trade-through rule is a prime example of a regulatory distortion of market competition. This SEC mandate effectively acts as a government-sponsored lifeline to markets that would not otherwise be competitive. An alternative to the trade-through rule, wisely recommended by Commissioners Atkins and Glassman, would be to clarify the broker's duty of best execution — which does not always mean execution at the national best bid or offer.[15] It is important to note that FINRA's best execution rule identifies five factors in addition to price that must be considered: the character of the market for the security; the size and type of transaction; the number of markets checked; the accessibility of the quotation; and the terms and conditions of the order as communicated to the firm.[16]

It's worth emphasizing that the dialogue surrounding market structure review must include a discussion of broker-dealers' duties as well. Since the Flash Crash of 2010, the Commission has focused on the responsibilities of exchanges to ensure execution quality without recognizing the role played by broker-dealers and their best execution obligations.

As we do focus on exchange responsibilities, however, and as I have stated many times before, the SRO model needs to be reviewed. We need to revisit the fundamental question of whether or not national securities exchanges should still be SROs.[17]

2/12/26, 2:01 PM                    Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

Case 1:25-cv-00495-KMN Document 1-7 Filed 02/27/26 Page 4 of 12

SROs serve a vital function in regulatory oversight. However, given that the fact that the majority of the equities exchanges outsource their regulatory obligations and market surveillance to FINRA, we have to reexamine the very meaning of a "self-regulatory organization." In addition, we need to address the fact that over 35% of securities transactions today are effected not on exchange platforms, but rather through ATSs.[18]

This matters because exchanges designated as SROs are, among other things, subject to rules and restrictions that do not apply to ATSs. For example, they face ownership limitations and must file any proposed rule change with the SEC for notice and comment, and in some cases a substantial review, through the formal and sometimes lengthy "Rule 19(b)" process. An ATS, on the other hand, faces no such ownership restrictions and is required only to file an amendment to their Form ATS at least 20 calendar days prior to implementing a material change to its operation.[19] This dichotomy risks making ATSs nimbler and better equipped to make quick adjustments to their operations than exchanges, unintentionally putting the latter at a disadvantage.

Therefore, a holistic review of equity market structure must explore difficult questions with respect to SROs; such as: What is the appropriate balance of regulatory oversight between the government and by market participants themselves? Does it still make sense to distinguish between national securities exchanges and ATSs? Should we distinguish between exchanges that list securities and those that do not? Should SROs continue to enjoy immunity based on their historical quasi-governmental status? These are difficult questions that I believe must be considered in the course of the market structure review.

As a side note, there has been a lot of chatter over the past several years about the presumed inherent conflict of interest posed by the evolution of securities exchange into for-profit public companies. This concern rests, however, on an unfounded, nostalgic view of the "good old days" of opaque, private exchange memberships featuring specialists trading in eighths and getting a privileged peak at order flow. This rose-colored view of the past ignores the downsides and inefficiencies of the old system as well as the very real benefits that are the result of the conversion of securities exchanges to public companies, which has provided a much-needed layer of public transparency into an incredibly complicated and evolving business model. Nothing akin to this transparency, I'll note, exists for dark venues.

Moving from one acronym to another, securities information processors, or SIPs, also deserve a close look.[20] According to the legislative history of the 1975 Amendments, a SIP, which consolidates and disseminates market data, is a "public utility" that should be regulated accordingly.[21] Importantly, the Senate Report on that legislation stated that an exclusive central information processor "should not be under the control or domination of any particular market center."[22] As noted by one academic, this language implies Congress' preference for competing last sale and quotation intermarket reporting services."[23]

Today, there are two exclusive primary information processors for equity transactions, one for consolidated transaction data and consolidated quotation data, the other for transactions

2/12/26, 2:01 PM   SEC.gov | Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

Case 1:26-cv-00495-RMN   Document 1-7   Filed 02/27/26   Page 5 of 12

executed pursuant to unlisted trading privileges. Each SIP is currently owned and operated by an affiliate or subsidiary of a major exchange. Although all of the equities exchanges are participants in Reg NMS Plans that govern the SIPs, there is no competition for consolidated last sale and quotation reporting services between the SIPs.

The market, however, has provided its own solution to the lack of competition: market participants can purchase the top-of-book data directly from exchanges through their proprietary feeds. The direct feeds provide real-time transaction data for a given exchange in contrast to SIPs, which consolidate transaction data from all exchanges before dissemination. The result of this consolidation process means that the SIP data lags behind the direct feeds.

As is the case with most utilities, reliance on SIPs results in a single point of failure. As we saw in August 2013, when a failure in the Nasdaq SIP led to the suspension of all trading in NASDAQ securities, a disruption to the SIP feed can have a significant negative effect. [24]

Unlike the utility processors, providers of direct feeds have every incentive to innovate to keep up with competition and constantly improve their technology. Moreover, there is no single point of failure risk with direct feeds. Consequently, we must reconsider whether it is appropriate to continue to rely on the utility model, a relic of a mid-1970s congressional infatuation with utilities, with its built-in delays and potentially catastrophic crashes. Instead, we should consider the advantages of a market approach that enables market participants to decide which data feeds to utilize, and require corresponding disclosure as appropriate. As part of this approach, we could mandate that the exchanges make their direct feeds available, for a fee, to third-party data venders, who can then aggregate the last-sale prices. This could facilitate market competition for consolidated data.

In addition to confronting these difficult questions with respect to equity market structure, we need to increase our focus on fixed income markets. I'll begin by noting a bitter irony. Despite, or perhaps because of, the intense focus that the Fed-dominated Financial Stability Oversight Council has placed on identifying so-called systemically important financial institutions, such as MetLife, the members of FSOC seem oblivious to an actual systemic risk percolating right under their noses: the risk building in the critically important fixed income markets. While FSOC is obsessing with regulating Snoopy and the rest of the Peanuts gang, there are big-dollar issues at stake in the fixed income markets. An even greater irony is that this systemic risk is a direct result of the Fed's interest rate and QE policies.

Debt financing is a critical part of the U.S. capital markets and plays a central role in the operation and stability of both our public and private sectors. Municipal bonds, of which there are approximately $3.7 trillion in principal amount outstanding, allow state and local governments to finance their infrastructure projects.[25] Long term municipal bond sales for August alone totaled $24.4 billion, a 7% increase from August of last year.[26]

The corporate bond markets enable companies to operate and grow their business through capital investments. There is over $11.3 trillion outstanding in the corporate debt market; in fact, U.S. bond issuances, totaling nearly $1 trillion, are at an all-time high.[27] The average daily trading volume for fixed income securities of all kinds in August 2014 was $690.8 billion.[28]

Retail participation in the municipal and corporate bond market is very high: 72% in the municipal markets and 46% in the corporate markets. And yet, these markets are incredibly opaque to retail investors.

It's no secret what is driving investors into these markets despite their opaque nature: the search for yield arising from over six years of near-zero interest rates set by the Federal Reserve. Demand for fixed income investments has grown far faster than that for equities; meanwhile, the spreads to Treasuries have continued to narrow.[29] This makes the fixed income markets, and in particular high yield debt, vulnerable to outflows with only a small increase in interest rates — just look at what happened in the summer of 2013, when the Dow tumbled over 200 points after former Fed Chairman Bernanke simply hinted at the possibility of a rate hike.

Yet the Fed is under increasing pressure from inflationary hawks to start raising rates or risk having inflation veer out of control.[30] Their critics, the doves, worry more about a still-subpar job market. The real concern, however, is that if the Fed is underestimating inflation risks, it could be forced to rapidly raise interest rates without allowing the market time to adjust. This would wreak havoc on the debt markets.

While we have record issuances in corporate bonds, the dealer inventory and liquidity in the secondary markets has dramatically decreased. Bond market participants are rightfully afraid that when rates rise, the ability to exit the market will be far more restricted than in the past.[31] Historically, dealers have dominated market-making in the secondary corporate bond market, using substantial amounts of their balance sheets to provide liquidity. Dealers acted as buffers absorbing the bonds that investors wanted to sell and holding the inventory until an appropriate buyer could be found. That is no longer the case today. Given enhanced risk management and regulatory constraints, most notably the Volker Rule and Basel III, dealer inventories of corporate bonds have dropped nearly 75% between 2008 and 2013.[32]

Consequently, there is significant risk that when the Fed starts to hike interest rates, outflows from high yielding and less liquid debt potentially could lead to a free fall in prices. [33]

Now that I have sufficiently scared you with doom and gloom scenarios facing the bond markets, let's discuss what the SEC can do. For the past several years, banking regulators and others have attempted to graft their systemic risk mandate on to the SEC's own or otherwise dragoon the agency into the already broad group of systemic risk regulators. This is as unwise as it is impractical.

2/12/26, 2:01 PM                 SEC.gov | Remarks to the Georgetown University Center for Financial Markets and Policy Conference on Financial Markets Quality

Case 1:26-cv-00495-RMR    Document 1-7    Filed 02/27/26    Page 7 of 12

That being said, I believe that by faithfully carrying out our mandate to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation in the fixed income markets, we can address some of the underlying systemic risk arising in those markets. In particular, I believe that the SEC, as the primary regulator of the fixed income markets for non-government instruments, can address the opacity of these markets by requiring greater price transparency. Additionally, we can address liquidity risks by facilitating electronic dealer-to-dealer and on-exchange transactions of these products. Such changes in the secondary market can only happen, however, if the Commission commits the necessary resources to incentivize standardized primary offerings. Currently, most corporate bonds are highly differential and bespoke. In order to facilitate electronic and on-exchange transactions, some degree of standardization of these products will be necessary.

The Commission must take the lead on this issue, but it is incumbent upon industry to find an efficient and expedient path forward. For example, perhaps issuers could agree upon a standard set of terms for debt contracts — something akin to an ISDA contract for swaps. The exchanges and dealer community also need to participate in this discussion by providing "in the weeds" input on what rule changes may be needed to facilitate electronic debt market trading. The Commission, for its part, should proactively analyze its rulebook to eliminate impediments — for example, registration requirements. And I would be remiss if I didn't point out that the Commission needs to do something about the de facto monopoly forcing the use of CUSIPs in the fixed income markets, starting with removing references to CUSIPs from our rules.

I will not pretend that migrating fixed income transactions from the OTC markets is a small task; however, I will note that in the early part of the twentieth century, there was an active market in corporate and municipal bonds on the New York Stock Exchange.

I believe the Commission should engage investors and the industry on this issue and review its rules and regulations to determine a path forward. If we fail to come together to determine this path, we risk a disastrous liquidity crunch and the attendant negative impacts on our economy. And it isn't a stretch to think that Congress could respond to such a crisis by mandating that all corporate bonds be executed on-exchange platforms, such as they for swaps in the ham-fisted Title VII of Dodd-Frank.

The SEC, together with FINRA and the MSRB, must also come together to educate retail investors about these products and their corresponding costs, for price transparency is a hallmark of fair and efficient markets. I am pleased to report that the MSRB recently approved proposals to enhance disclosure of pricing information for retail investors and expand the availability of pre-and post-trade data on the EMMA website.[34]

It is clear that tough reforms are needed in the fixed income markets, and to accomplish them, the Commission must be serious about allocating resources. Our Office of Market Supervision in the Division of Trading and Markets employs over a hundred staffers devoted to the oversight of the equity and options markets. By contrast, our Office of Municipal

Securities is comprised of just six employees.[35] Even more striking is the fact that we have no staff focused exclusively on the corporate bond market. We must allocate resources within the Commission to appropriately deal with the risks in the fixed income markets. It is time to address *Liar's Poker*.

Thank you for inviting me to speak with you today, and I hope you have a productive and enjoyable conference.

---

[1] Lewis, Michael, *Flash Boys* (2014).

[2] *See* Bell, Holly and Harrison Searles, "Working Paper: An Analysis of Global HFT Regulation: Motivations, Market Failures and Alternative Outcomes" (April 2014) (summarizing conclusions by a variety of academics); available at http://mercatus.org/sites/default/files/Bell_GlobalHFTRegulation_v2.pdf (http://mercatus.org/sites/default/files/Bell_GlobalHFTRegulation_v2.pdf); *see also* Jones, Charles "What do we know about High-Frequency Trading" *Columbia Business School Research Paper No. 13-11* (March 20, 2013); available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2236201 (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2236201).

[3] Pub. L. No. 94-29, 89 Stat. 97 (1975).

[4] Tuttle, Laura, "OTC Trading: Description of Non-ATS OTC Trading in National Market System Stocks," (March 2014); available at http://www.sec.gov/marketstructure/research/otc_trading_march_2014.pdf (http://www.sec.gov/marketstructure/research/otc_trading_march_2014.pdf). The list of ATSs registered with the SEC is available at http://www.sec.gov/foia/ats/atslist0914.pdf (http://www.sec.gov/foia/ats/atslist0914.pdf).

[5] "Market 2012: Time for a Fresh Look at Equity Market Structure and Self-Regulation," remarks by Commissioner Daniel M. Gallagher before SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012) ("Market Structure 2012 Speech"); available at http://www.sec.gov/News/Speech/Detail/Speech/1365171491376#.VAdXsvldXqM (http://www.sec.gov/News/Speech/Detail/Speech/1365171491376#.VAdXsvldXqM).

[6] *Id.*

[7] "Seeing Capital Markets Through Investor Eyes," remarks by Commissioner Luis A. Aguilar before the Consumer Federation of America's 26th Annual Conference (Dec. 5, 2013); "The Benefit of Hindsight and the Promise of Foresight: A Proposal for A Comprehensive Review of

Equity Market Structure," remarks by Commissioner Michael S. Piwowar before the 2013 Global Trading and Market Structure Conference (Dec. 9, 2013); Remarks by Commissioner Kara M. Stein before the Trader Forum 2014 Equity Trading Summit (Feb. 6, 2014).

[8] "Enhancing Our Equity Market Structure," remarks by Chair Mary Jo White before Sandler O'Neil & Partners, L.P. Global Exchange and Brokerage Conference New York, N.Y. (Jun. 5, 2014).

[9] Market Structure 2012 Speech, *supra* note 5.

[10] *See* "Dissent of Commissioners Cynthia A. Glassman and Paul S. Atkins to the Adoption of Regulation NMS," available at http://www.sec.gov/rules/final/34-51808-dissent.pdf (http://www.sec.gov/rules/final/34-51808-dissent.pdf) ("Dissent to Regulation NMS").

[11] *See* Dissent of Regulation NMS at footnote 3, *quoting* Senate Committee on Banking, Housing and Urban Affairs, S. Rep. No. 94-75, 94th Cong., 1st Sess. (1975) ("Senate Report"), at 13-14:

[T]he Commission's responsibility [is] to balance the perceived anti-competitive effects of the regulatory policy or decision at issue against the purposes of the Exchange Act that would be advanced thereby and the costs of doing so. Competition would not thereby become paramount to the great purposes of the Exchange Act, but the need for and effectiveness of regulatory actions in achieving those purposes would have to be weighed against any detrimental impact on competition.

[12] *See* Dissent to Regulation NMS, at page 2, and at footnote 4 *quoting* H.R. Rep. No. 94-229, 94th Cong., 1st Sess. (1975) ("Conference Report"), at 92 ("It is the intent of the [House and Senate] conferees that the national market system evolve through the interplay of competitive forces as unnecessary regulatory restrictions are removed."). *See also* Dissent to Regulation NMS at footnote 5 *quoting* Senate Report at 12 ("This is not to suggest that …. The SEC would have either the responsibility or the power to operate as an 'economic czar' for the development of a national market system.").

[13] *See* Dissent to Regulation NMS at page 2.

[14] 17 C.F.R. 242.611.

[15] *See* Dissent to Regulation NMS at pages 2-3.

[16] FINRA Rule 5310 Best Execution and Interpositioning; available at http://finra.complinet.com/en/display/display.html?rbid=2403&record_id=15739&element_id=10455&highlight=5310#r15739 (http://finra.complinet.com/en/display/display.html?rbid=2403&record_id=15739&element_id=10455&highlight=5310#r15739). FINRA Rule 5310 requires, among other things, that the broker-dealer consider the following factors: (A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications); (B) the size and type of

transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member.

[17] Market Structure 2012 Speech, *supra* note 5.

[18] Staff of the Division of Trading and Markets, Securities and Exchange Commission, "Equity Market Structure Literature Review, Part I: Market Fragmentation," at footnote 19 (Oct. 7, 2013); available at http://www.sec.gov/marketstructure/research/fragmentation-lit-review-100713.pdf (http://www.sec.gov/marketstructure/research/fragmentation-lit-review-100713.pdf).

[19] 17 C.F.R. 242.301(b)(2)(ii).

[20] The 1975 Amendments added a definition of a securities information processor to Section 3(a)(22)(A) of the 34 Act. A securities information processor is any person engaged "in the business of (i) collecting, processing, or preparing for distribution or publication, or assisting, participating in, or coordinating the distribution or publication of, information with respect to transactions in or quotations for any security (other than an exempted security) or (ii) distributing or publishing (by means of a ticker tape, a communications network, a terminal display device, etc.) on a current and continuing basis information with respect to such transactions or quotations." A SIP must be registered with the SEC; *see* Form SIP available at https://www.sec.gov/about/forms/formsip.pdf (https://www.sec.gov/about/forms/formsip.pdf).

[21] *See* Oesterle, Dale A. "Congress's 1975 Directions to the SEC for the Creation of a National Market System: Is the SEC Operating Outside the Mandate?" (May 2004); *Ohio State Public Law Working Paper No. 11*; available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=539723 (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=539723) ("Congress's 1975 Directions to the SEC Paper") *citing* Senate Report at 11 and Conference Report 94-229 at 93.

[22] *See* Congress's 1975 Directions to the SEC Paper, *referencing* Senate Report at 11.

[23] *See* Congress's 1975 Directions to the SEC at page 8.

[24] Stafford, Philip, "Nasdaq blames software flaw for trading outage," *Financial Times* (Aug. 29, 2013); available at http://www.ft.com/intl/cms/s/0/138ccd6c-10c7-11e3-b5e4-00144feabdc0.html#axzz3CNWxwLhB (http://www.ft.com/intl/cms/s/0/138ccd6c-10c7-11e3-b5e4-00144feabdc0.html#axzz3CNWxwLhB).

[25] *See* Federal Reserve Board, "Flow of Funds Accounts of the U.S." at Table L.211 (First Quarter 2014) (providing market capitalization numbers for municipal securities); available at http://www.federalreserve.gov/releases/z1/current/z1.pdf (http://www.federalreserve.gov/releases/z1/current/z1.pdf).

[26] Flynn, Hillary, "August Muni Volume Rises 7%," *The Bond Buyer,* (Sep. 2, 2014); available at http://www.bondbuyer.com/news/markets-sell-side/august-muni-volume-rises-7-1065728-1.html (http://www.bondbuyer.com/news/markets-sell-side/august-muni-volume-rises-7-1065728-1.html).

[27] Cherney, Mike, "U.S. Bond Issuance Nears $1 Trillion," *The Wall Street Journal* (Aug. 21, 2014); available at http://online.wsj.com/articles/u-s-bond-issuance-nears-1-trillion-1408651952 (http://online.wsj.com/articles/u-s-bond-issuance-nears-1-trillion-1408651952).

[28] *See* SIFMA US Bond Market Trading Volume Data (note the total volume includes municipal securities, Treasury securities, Agency MBS, non-Agency MBS, ABS, corporate debt, Federal Agency securities); available at http://www.sifma.org/research/statistics.aspx (http://www.sifma.org/research/statistics.aspx).

[29] *See* Sender, Henny "Fed must not linger too long on QE exit," *Financial Times* (July 4, 2014) ("Fed must not linger"); available at http://www.ft.com/intl/cms/s/0/abaedfd4-02bd-11e4-8c28-00144feab7de.html (http://www.ft.com/intl/cms/s/0/abaedfd4-02bd-11e4-8c28-00144feab7de.html).

[30] *See* Brown, Matthew "As Conference Ends, Economists Give Clashing Views," *Associated Press* (Aug. 23, 2014); available at http://bigstory.ap.org/article/conference-ends-economists-give-clashing-views (http://bigstory.ap.org/article/conference-ends-economists-give-clashing-views).

[31] *See* Fed must not linger, *supra* 29.

[32] Burne, Katy, "Banks Consider New Corporate-Bond Trading Network," *The Wall Street Journal* (Nov. 22, 2013); available at http://online.wsj.com/news/articles/SB10001424052702304337404579214092115777898 (http://online.wsj.com/news/articles/SB10001424052702304337404579214092115777898); *see also* Aneiro, Michael, "Global Risk Reappears, Bonds Benefit: Geopolitical dangers triggered a rush into sovereign paper. Meanwhile, corporate bonds are a pocket of risk." *Barron's* (July 19, 2014); available at http://online.barrons.com/news/articles/SB50001424053111904255004580029312208066450 (http://online.barrons.com/news/articles/SB50001424053111904255004580029312208066450).

[33] *See* Fed must not linger, *supra* note 29.

[34] "MSRB Holds Quarterly Meeting," (Aug. 5, 2014); available at http://www.msrb.org/News-and-Events/Press-Releases/2014/MSRB-Holds-Quarterly-Meeting-July-2014.aspx (http://www.msrb.org/News-and-Events/Press-Releases/2014/MSRB-Holds-Quarterly-Meeting-July-2014.aspx). http://www.bondbuyer.com/news/washington-securities-law/msrb-to-propose-new-price-transparency-rule-1065019-1.html (http://www.bondbuyer.com/news/washington-securities-law/msrb-to-propose-new-price-transparency-rule-1065019-1.html); *see also* Glazier, Kyle, "MSRB to Propose New Price Transparency Rule," *The Bond Buyer* (Aug. 5, 2014); available at http://www.bondbuyer.com/news/washington-securities-law/msrb-to-propose-new-price-

transparency-rule-1065019-1.html (http://www.bondbuyer.com/news/washington-securities-law/msrb-to-propose-new-price-transparency-rule-1065019-1.html). Although these developments are encouraging, I would be remiss if I did not note that one of the biggest issues facing muni investors is the failure by municipal issuers to disclose the true extent of pension and other post-employment benefit obligations. There are trillions of dollars in liabilities that are not adequately reflected on government books. The severity of these unfunded pension obligations and their potential impact on investors are real. GASB has recently made strides in improving its standards. But more can and should be done. In the meantime, issuers should be making certain supplemental disclosures to ensure that users of financial statements prepared using GASB standards are fully informed of these risks. See "Remarks at the Municipal Securities Rulemaking Board's 1st Annual Municipal Securities Regulator Summit," by Commissioner Daniel M. Gallagher (May 29, 2014); available at http://www.sec.gov/News/Speech/Detail/Speech/1370541936387 (http://www.sec.gov/News/Speech/Detail/Speech/1370541936387).

[35] In addition, the Division of Enforcement has a specialty group dedicated to prosecuting violations related to municipal securities.

Last Reviewed or Updated: Sept. 16, 2014