IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Global Infrastructure Finance and Development Authority Inc., <br><br> Plaintiff, <br><br> v. <br><br> CUSIP Global Services and FactSet Research Systems Inc., <br><br> Defendants. | **Case No. 1:26-CV-00495** <br><br> **(Judge Neary)** <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

A.     The Parties and Financial Identifiers ................................................ 3

B.     CGS Has a Basic Application Process for CUSIP Identifiers....................... 4

C.     GIFDA Requests CUSIP Identifiers for Corporate Debt .............................. 5

D.     GIFDA Requests CUSIP Identifiers for Municipal Debt............................. 5

E.     The Parties Continue Discussions, and CGS Offered a Potential
       Alternative Solution........................................................................... 7

LEGAL STANDARD................................................................................. 9

ARGUMENT ......................................................................................... 10

I.     GIFDA Cannot Demonstrate a Substantial Likelihood of Success
       on Its Antitrust Claims...................................................................... 10

       A.   GIFDA Fails to Allege a Viable Antitrust Theory, Antitrust
            Standing, Monopoly Power, or an Antitrust Relevant Market.............. 11

       B.   CGS Reasonably Exercised Its Discretion.............................................. 16

II.    GIFDA Has Not Suffered Irreparable Harm ..................................................17

III.   The Balance of Equities and Public Interest Tip Against a Mandatory
       Injunction ...........................................................................................18

CONCLUSION ..................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)..................................................................................10,17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)..................................................................................12, 13, 14

*Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*,
528 F.3d 176 (3d Cir. 2008)........................................................................................18

*Birdman v. Office of the Governor*,
677 F.3d 167 (3d Cir. 2012)........................................................................................10

*Bd. of Trade of Chi. v. United States*,
246 U.S. 231 (1918)........................................................................................16

*Brown v. Monsalud*,
2023 U.S. Dist. LEXIS 210662 (M.D. Pa. Sept. 19, 2023)....................................10

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)........................................................................................16

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*,
159 F.3d 129 (3d Cir. 1998)........................................................................................15

*ECRI v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987)........................................................................................19

*Elad v. NCAA*,
160 F.4th 407 (3d Cir. 2015) ........................................................................................9, 20

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
847 F.2d 100 (3d Cir. 1988)........................................................................................18

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)........................................................................................19

*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020)........................................................................................10

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) ........................................................................................11, 12, 15

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
90 F.3d 737 (3d Cir. 1996)......................................................................................13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989).....................................................................................18

*Johnson v. Guhl*,
91 F. Supp. 2d 754 (D.N.J. 2000) ............................................................................20

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ...........................................................................13, 19

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
496 F.2d 214 (3d Cir. 1974)....................................................................................19

*Morton v. Beyer*,
822 F.2d 364 (3d Cir. 1987).....................................................................................17

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)...................................................................................................9

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................................21

*Queen City Pizza v. Domino's Pizza*,
124 F.3d 430 (3d Cir. 1997).....................................................................................15

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010).......................................................................................16

*Schuylkill Energy Res. v. Pa. Power & Light Co.*,
113 F.3d 405 (3d Cir. 1997).....................................................................................11

*SEI Glob. Servs., Inc. v. SS&C Advent*,
496 F. Supp. 3d 883 (E.D. Pa. 2020) .................................................................12, 13

*Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*,
2022 U.S. Dist. LEXIS 64999 (M.D. Pa. Apr. 7, 2022).........................................17

*Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*,
735 F.3d 131 (3d Cir. 2013).....................................................................................10

*United States v. Colgate & Co.*,
250 U.S. 300 (1919)........................................................................................1, 11, 14

*United States v. Terminal R.R. Ass'n of St. Louis*,
224 U.S. 383 (1912).............................................................................................13

*Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..............................................................................12, 13, 14

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................................................18

**Statutes**

15 U.S.C. § 2 .....................................................................................................12

**INTRODUCTION**

Do the antitrust laws require Defendant CUSIP Global Services ("CGS") to issue CUSIP identifiers to Plaintiff Global Infrastructure Finance and Development Authority Inc. ("GIFDA")? As a matter of law, the answer is no. Courts have long recognized the "right of trader . . . freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Disregarding over a century of settled antitrust law, GIFDA, a potential customer of CGS, asks this Court to take the extraordinary step of *compelling* CGS to ignore its review procedures and issue CUSIP identifiers to GIFDA. Granting that request would distort the antitrust laws and directly contradict *Colgate*. The Court should decline that invitation for the following reasons.

*First*, GIFDA is a potential customer of CGS that does not compete with CGS. Courts have recognized a unilateral duty to deal or an essential facilities claim only in the rare case where a dominant firm, forgoing short-term profits, deliberately denies a *rival* access to an input the rival needs to compete. CGS and GIFDA are not competitors, and thus, no such claim exists here. *Second*, GIFDA cannot prove that the conduct in question harmed competition—namely, that CGS's refusal to issue certain CUSIP identifiers to GIFDA raised prices, reduced output, or stifled innovation in a cognizable antitrust market.

1

GIFDA's motion for emergency relief should fail for another reason. GIFDA cannot show irreparable harm, let alone the extraordinary harm necessary to support a mandatory injunction. Lest there be any doubt, the facts show that this dispute has been percolating for over a year (or four years according to GIFDA), reinforcing the conclusion that emergency relief is inappropriate. That GIFDA sat on its hands for years is not surprising since monetary damages can remedy GIFDA's alleged harm. Finally, the balance of equities and public interest necessitate that CGS's straightforward and reasonable procedures, which limit the issuance of CUSIPs to firms that meet CGS's requirements, should not be disturbed for GIFDA, an entity that failed to adhere to these procedures.

The motion should be denied.

## BACKGROUND

### A.    The Parties and Financial Identifiers.

GIFDA is a purported 501(c)(3) nonprofit corporation. ECF No. 4, Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj. ("MOL") ¶ 17. GIFDA claims to engage in "financing, acquiring, constructing, operating, managing, and maintaining significant infrastructure projects, including high-speed rail systems[.]" *Id.* Defendant FactSet Research Systems Inc. ("FactSet") is a global financial data, software, and analytics services company. Ex. 1, Declaration of Jona Kim ("Kim Decl.") ¶ 3. Defendant CGS is a business unit within FactSet. Kim Decl. ¶ 3. CGS

2

administers the CUSIP system on behalf of the American Bankers Association. Ex. 2, Declaration of Gerard Faulkner ("Faulkner Decl.") ¶ 3. CGS has two distinct lines of business: (1) issuing CGS identifiers to firms that meet CGS's eligibility requirements, and (2) licensing access to various databases that include compilations of CGS identifiers and up to 60+ fields of structured data (referred to as CGS data) with respect to each financial instrument. *Id.* ¶ 5.

A CUSIP is a nine-character alphanumeric code that financial services institutions, firms, and professionals use to identify financial instruments (also referred to as "securities") issued in the United States and Canada. *Id.* ¶ 4. In addition to issuing CUSIPs and other CGS identifiers, CGS also issues Private Placement Numbers ("PPN"). *Id.* ¶ 60. A PPN is different from a CUSIP identifier and has a different application process. *Id.* ¶¶ 61-63. A PPN cannot be used to settle or clear trades of municipal bonds at the Depository Trust Company. *Id.* ¶ 63; *see also* MOL ¶ 4.

GIFDA—an alleged infrastructure financing company—does not issue financial identifiers of any type. *See* MOL ¶ 17. GIFDA also does not compete with FactSet or CGS in any market, including the alleged relevant market. Kim. Decl. ¶ 3; Faulkner Decl. ¶ 5; MOL ¶ 69 (alleging a relevant market for "securities identification numbers required for U.S. capital market access."). GIFDA has not supported this motion with any allegations (or evidence) that the conduct at issue

has harmed competition in the alleged relevant market for the issuance of identifiers for securities. Nor does it support this motion with allegations (or evidence) supporting the existence of that market, or CGS's supposed monopoly power in it.

**B.    CGS Has a Basic Application Process for CUSIP Identifiers.**

CGS assigns CUSIP identifiers for some but not all financial instruments. Faulkner Decl. ¶ 6.[1] CGS typically follows the same process for each proposed issuance of the same type of asset class. *See id.* ¶¶ 7-14. A requester must apply for the identifier through CGS's website, upload the appropriate legal documents, and agree to CGS's "Disclaimer and Other Terms," which explicitly state that CGS has sole discretion to determine whether to issue a CUSIP identifier for a particular financial instrument. *Id.* ¶¶ 7-10.

CGS then evaluates the request, assessing basic metrics like whether it contains conventional issue descriptions. *Id.* ¶ 11. Most CUSIP requests meet these minimum requirements. *Id.* When they do, CGS provides the requester with a confirmation of the issued CUSIP identifier. *Id.* ¶ 12. When the request is denied, CGS notifies the requester and may explain the rationale for its decision. *Id.* ¶ 13.

---

[1] As publicly stated by Bloomberg L.P., there are alternative financial identifiers available. *See* ECF No. 1-3 at 4 (listing Bloomberg's FIGI, SEDOLs, and Ticker symbols).

### C.      GIFDA Requests CUSIP Identifiers for Corporate Debt.

GIFDA alleges that its Chairman, Shah Mathias, personally applied for CUSIP identifiers for seven financial instruments between May and September 2022. MOL ¶ 40. In reality, GIFDA and its apparent affiliates made *twelve total* applications for corporate debt securities (hereinafter "Corporate Debt") between May 2022 and October 2024, with most happening in August 2022. Faulkner Decl. ¶¶ 15-19, 25. For the August 2022 requests, CGS issued two CUSIP identifiers but withdrew them after demonstrated problems with the issuance. *See id.* ¶¶ 20-22. CGS issued one CUSIP for GIFDA's request made on September 16, 2022. *Id.* ¶ 23. GIFDA and its affiliated entities then requested six more CUSIP identifiers for Corporate Debt between May 2023 and October 2024—three of which resulted in the issuance of a CUSIP. *Id.* ¶ 24.

### D.      GIFDA Requests CUSIP Identifiers for Municipal Debt.

On November 27, 2024, Mohammad Khan, on behalf of GIFDA, submitted a request for a CUSIP identifier for an alleged municipal bond (the "Municipal Debt").[2] Faulkner Decl. ¶ 27. The proposed Municipal Debt raised immediate concerns because such requests are typically submitted by the underwriter, a financial advisor, or bond counsel. *Id.* ¶ 29. Municipal issues must also be issued by

---

[2] CGS denied a request for a CUSIP identifier for "bonds issued by EnerTech Holding Company on behalf of the Kingdom of Kuwait[,]" (MOL ¶ 56), because no offering document was included with that request. Faulkner Decl. ¶¶ 57-59.

a municipality or an issuer directly affiliated with a municipality. *Id.* ¶ 30. Occasionally, issuers directly submit requests, but that is rare for municipal requests. *Id.* Since GIFDA—neither a municipality nor issuer directly affiliated with a municipality—submitted the request, this prompted CGS to apply additional scrutiny. *Id.* ¶ 31. CGS's staff alerted GIFDA that it had never seen a CUSIP application for Municipal Debt like GIFDA's. ECF No. 1-28 at 1. Additionally, the sheer size of the bond issuance—$40 billion dollars—coupled with the fact that GIFDA was an unknown entity as an issuer of municipal debt, were unusual for a CUSIP application for municipal debt. Faulkner Decl. ¶¶ 32-33.

Thus, on November 29, 2024, Gerard Faulkner, Head of CGS Data Operations, responded that the "request does not qualify for a CUSIP" because GIFDA "is not a U.S. municipal issuer" and that a CUSIP was not needed for this transaction. Ex. 3 [Nov. 2024 Faulkner Email] at 1; Faulkner Decl. ¶ 28. After this initial exchange, GIFDA submitted two more municipal requests, leading Mr. Faulkner to explain to Mr. Khan that CGS "replied a few times" about the request "not qualify[ing] [for] or need[ing] a CUSIP[.]" Ex. 4 [Dec. 2024 Faulkner Email] at 1; Faulkner Decl. ¶¶ 34-35. Over the next few months, Mr. Faulkner reiterated CGS's position, noting that CGS would not issue CUSIP identifiers for the Municipal Debt for the reasons it has previously explained to GIFDA. Faulkner Decl. ¶¶ 35-39.

6

E.    **The Parties Continue Discussions, and CGS Offered a Potential Alternative Solution.**

On July 30, 2025, CGS personnel participated in a video call with GIFDA. Faulkner Decl. ¶ 42. During the call, GIFDA represented that "First Boston Global Custody and Trust Company" ("First Boston") would serve "as Underwriter and Placement Manager" for the Municipal Debt. *Id.* ¶ 43. Thereafter, CGS again evaluated whether to issue CUSIP identifiers for the Municipal Debt. *Id.* ¶ 44. On September 16, 2025, CGS again denied the Municipal Debt CUSIP application. ECF No. 1-28 at 10. The next day, counsel for GIFDA responded with a multi-page email and five attachments. *See id.* at 4-10.

In the interest of reaching a resolution, CGS continued to engage with GIFDA. On September 26, 2025, Jeffrey Mitnick, Senior Vice President and Assistant General Counsel of FactSet, wrote that CGS "need[ed] GIFDA to fill in gaps in its CUSIP assignment applications for there to be any reconsideration of the applications." Ex. 5 [Fall 2025 Email Correspondence] at 10. For example, GIFDA's application included an Alabama state resolution but did not include "corresponding legislation or state funding of note[.]" *Id.*[3] Mr. Mitnick also stated that GIFDA did

---

[3] *See also* ECF No. 1-12 at 1 (20-year-old legislation from Alabama that does not mention GIFDA); ECF No. 1-14 at 1, 3 (two unsigned resolutions from Georgia that do not mention GIFDA); ECF No. 1-16 (Commonwealth of Pennsylvania referenced in a press release concerning a "historic $4 billion tokenized financing package").

7

"not disclose a recognized underwriter in the municipal market supporting such an unusually large bond offering," and that its purported underwriter, First Boston, was "based in the United Kingdom." *Id.*

After prolonged correspondence, the parties agreed to a phone conference on October 23, 2025, with First Boston. Kim Decl. ¶ 7. One day before that meeting, a representative for GIFDA informed CGS that First Boston would instead "serve as the introducing broker to UBS, acting as the broker-dealer/underwriter[.]" Ex. 5 at 1. That same day, Louis King, Managing Director at First Boston, wrote to GIFDA and CGS:

> First Boston has never suggested that it is [a] licensed underwriter of bonds of any category in the US Markets[;] therefore[,] we do not know how or where that misinformation originated from . . . First Boston has never and does not intend to put itself forward as an underwriter of US Bonds.

Ex. 6 [First Boston Email] at 2; Kim Decl. ¶¶ 9-14. At the October 23, 2025, meeting, Jona Kim, Vice President and Associate General Counsel at FactSet, informed those in attendance, including GIFDA, that CGS would revisit whether to issue CUSIP identifiers if the underwriter (now potentially UBS) submitted the application on GIFDA's behalf. Kim Decl. ¶¶ 16-20.

CGS maintained that position. On February 3 and February 6, 2026, Mr. Faulkner told GIFDA that UBS should apply for CUSIP identifiers on GIFDA's behalf. Faulkner Decl. ¶¶ 50-52; ECF No. 1-15 at 2, 6. GIFDA never provided CGS

with contact information for any individual or department at UBS. Faulkner Decl. ¶ 53. Instead, when GIFDA changed documentation listing UBS as the underwriter, it designated a new address for UBS's wealth advisory business, which is completely distinct from underwriting. *Id.* ¶ 48. UBS never communicated with CGS on behalf of GIFDA, and CGS could not process GIFDA's CUSIP requests without the information CGS repeatedly requested (and never received). *Id.* ¶¶ 54-55. An October 2025 internal GIFDA document confirmed that it needed to provide CGS with a viable underwriter to receive the CUSIPs it requested. *See* ECF No. 1-28 at 3.

To date, GIFDA has not complied with CGS's suggested potential solution—having an underwriter or placement agent for the Municipal Debt apply for the CUSIP identifier—and thus CGS has declined to issue the requested CUSIPs to GIFDA. Faulkner Decl. ¶ 56.

## LEGAL STANDARD

"It is well-established that a 'preliminary injunction is an extraordinary and drastic remedy.'" *Elad v. NCAA*, 160 F.4th 407, 412 (3d Cir. 2015) (vacating injunction) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A movant "must make a 'clear showing' that an injunction is warranted." *Id.* Courts weigh four factors, including "(1) the movant['s] likelihood of success on the merits; (2) the risk that the movant[] will suffer irreparable harm absent preliminary relief; (3) the

balance of equities; and (4) the public interest." *Id.* (alterations in original) (citation omitted). "The first two factors are the 'most critical,' and only when they are both present do[es] [the Court] 'consider[] the others." *Id.* (citation omitted). The "moving party bears the burden 'to prove all elements[.]'" *Id.* at 413 n.2 (citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 n.10 (3d Cir. 2000)).

For a mandatory injunction that changes the status quo, "a heightened standard applies." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (citation omitted). A mandatory injunction is one that "commands that acts be done rather than not done[.]" *Birdman v. Office of the Governor*, 677 F.3d 167, 170 n.2 (3d Cir. 2012) (citation omitted). As a mandatory injunction is an "extraordinary remedy that is only granted sparingly by the courts," a movant must demonstrate that their "right to relief is indisputably clear." *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citation omitted). GIFDA must also make a "specific request" of the Court for injunctive relief. *See Brown v. Monsalud*, 2023 U.S. Dist. LEXIS 210662, at *5 (M.D. Pa. Sept. 19, 2023) (dismissing complaint where the plaintiff made no "specific request of the court").

## ARGUMENT

### I.   GIFDA Cannot Demonstrate a Substantial Likelihood of Success on Its Antitrust Claims.

As a threshold matter, GIFDA did not attach a proposed order outlining their request for a mandatory injunction to this Court. Thus, it has failed to adhere to the

10

basic requirement of crafting a proposed remedy that makes clear the relief it is seeking. If that were not enough, GIFDA has no cognizable antirust claim, let alone one that meets the heightened standard applied to mandatory injunctions.[4]

### A. GIFDA Fails to Allege a Viable Antitrust Theory, Antitrust Standing, Monopoly Power, or an Antitrust Relevant Market.

It is bedrock antitrust law that CGS has the unilateral right to set the terms upon which it will deal with its customers. CGS was well within those rights when it declined to issue some CUSIP identifiers to GIFDA. The Supreme Court's 100-plus-year-old *Colgate* doctrine holds that the "right of [a] trader or manufacturer engaged in an entirely private business[] [is] free[] to exercise his own independent discretion as to parties *with whom he will deal*." *Colgate*, 250 U.S. at 307 (emphasis added). GIFDA may disagree with CGS's screening process and the failure to obtain certain CUSIPs, but none of that means CGS's conduct conceivably *harms competition*. *See Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 (3d Cir. 2022) ("An objectionable term in a commercial agreement, without more, is not an antitrust violation[.]"); *see also Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 415 (3d Cir. 1997) (no monopolization claim where plaintiff was a supplier—not competitor—to the alleged monopolist).

---

[4] GIFDA's motion for a mandatory preliminary injunction is *solely* based on its antitrust claims and not its common law claims. *See* ECF No. 3.

The antitrust laws provide a narrow exception to the *Colgate* doctrine, which does not apply here. Specifically, the antitrust laws recognize a unilateral duty to deal when a dominant firm refuses to deal with a "competitor[]" and "only if the parties have a history of dealing paired with facts suggesting 'a willingness to forsake short-term profits to achieve an anticompetitive end.'" *Host Int'l*, 32 F.4th at 250 & n.7 (quoting *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). This limited line of cases involving refusals to deal *among rivals* is "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Since GIFDA *does not compete* with CGS in the asserted "market for securities identification numbers required for U.S. capital market access," this case is well beyond the boundaries of Section 2 of the Sherman Act (15 U.S.C. § 2). MOL ¶ 69. That alone warrants denying mandatory injunctive relief.

An examination of the cases where Section 2 of the Sherman Act recognized a unilateral duty to deal with a rival highlights the differences with this case. In those cases, a dominant firm allegedly monopolized a market by denying a rival access to something it needed to compete with the dominant firm. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985) (defendant refused to provide competitor ski pass it previously sold to others); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377-78 (1973) (refusing to sell power to municipalities seeking to build competing distribution infrastructure); *see also Trinko*, 540 U.S. at

411 (refusing to "add[] the present case to the few existing exceptions from the proposition that there is no duty to aid competitors"); *SEI Glob. Servs., Inc. v. SS&C Advent,* 496 F. Supp. 3d 883, 897-98 (E.D. Pa. 2020) (dismissing monopolization claim and explaining *Aspen Skiing*).

GIFDA's attempt to recast this duty-to-deal as an "essential facilities" case does nothing to salvage its claims. That doctrine also requires an actual or potential competitive relationship between the parties. *See Trinko*, 540 U.S. at 415 ("This conclusion would be unchanged even if we considered to be established law the 'essential facilities' doctrine crafted by some lower courts[.]"). That caselaw is also only "implicated 'where a monopolist controls a facility that *its competitors* need access to if they are to compete effectively.'" *SEI Glob. Servs.*, 496 F. Supp. 3d at 898 (E.D. Pa. 2020) (emphasis added) (citation omitted); s*ee also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996) (essential facilities claim requires, inter alia, allegation of denying "use of the facility *to a competitor*") (emphasis added). Furthermore, the law imposes a duty to deal with rivals only in narrow circumstances and only when doing so is necessary to promote competition in the market allegedly restrained—here, the alleged "market for securities identification numbers required for U.S. capital market access" (MOL ¶ 69). *See, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir.

13

1983) (alleged denial of essential facility to competitor); *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383, 409-11 (1912) (same).

But even where a duty to deal arises, courts are hesitant to craft remedies that require them to play the role of mini-regulators. As the late Professor Areeda observed: "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." *Trinko*, 540 U.S. at 415 (quoting Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 853 (1989)).[5] The longstanding *Colgate* doctrine (as modified by *Aspen Skiing* and *Trinko*) demonstrates that no mandatory injunction should issue. GIFDA has not even bothered to explain which CUSIPs the Court should compel CGS to issue or on what terms. While the Court does not need to reach this question because no duty

---

[5] GIFDA's reliance on other litigation is unavailing, as both matters concern licensing CGS data, not issuing CUSIP identifiers. *See Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, 2023 U.S. Dist. LEXIS 122036, at \*10 (S.D.N.Y. July 14, 2023) (plaintiffs allege that defendants forced "CUSIP Users to enter into license agreements with . . . S&P (and now FactSet)[.]"); MOL ¶ 7 (the European Commission investigation concerned "licensing fees to indirect users."). In any event, GIFDA misstates the record—the court in *Dinosaur Financial* did not make any such holdings but instead described plaintiffs' claims. *Compare* 2023 U.S. Dist. LEXIS 122036 at \*20, *with* MOL ¶ 5.

to deal exists on these facts, this provides another reason why this motion should be denied.

GIFDA also lacks antitrust standing. To meet this threshold requirement, GIFDA must allege, and prove, "that the challenged conduct affected the prices, quantity or quality" of securities identifiers, "not just [GIFDA's] own welfare." *Host Int'l*, 32 F.4th at 250 (quoting *Matthews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1997)). GIFDA alleges no such harm to competition, and, as such, its motion should be denied. *See id.*

GIFDA's claims likewise fail because it does not allege monopoly power. This element requires "something more" than "market share alone[,]" such as "barriers to entry" suggesting the dominant firm's power to exclude competition. *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998). Nowhere in its briefing does GIFDA plausibly argue any sort of monopoly power to exclude competition. *See generally* MOL.

Finally, GIFDA fails to allege a cognizable antitrust market because it does not allege sufficient facts concerning the "reasonable interchangeability and cross-elasticity of demand," nor does it allege a market "that encompass[es] all interchangeable substitute products[.]" *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997). Specifically, CGS's alleged 100% market share (MOL ¶ 21) is directly contradicted by GIFDA's claim that there are a multitude of

15

competing financial identifiers. *See* ECF No. 1-3 at 4 (listing Bloomberg's FIGI, SEDOLs, and Ticker symbols).

### B.   CGS Reasonably Exercised Its Discretion.

While GIFDA's antitrust claims should fail for the reasons detailed above without reaching an evaluation of the merits of its review process or its legitimate exercise of that process on these facts, such an evaluation buttresses the conclusion that this motion should be denied. The procedures governing CGS's issuance process have been designed to prevent the issuance of CUSIP identifiers for financial instruments that do not meet standard criteria. Faulkner Decl. ¶ 14. Those rules are reasonable and justify CGS's actions even if the antitrust laws somehow imposed some duty to deal in these circumstances on CGS. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (defendant "show[s] that it is actually promoting a pro-competitive or legitimate business objective[,]" which can save otherwise anticompetitive conduct). In addition, a firm's policies that "improve market conditions" by promoting trade do not violate the antitrust laws. *See, e.g.*, *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918). Rules that seek to prevent potentially "false or deceptive" conduct to improve market conditions are permitted, especially when implemented in a "market characterized by striking disparities between the information available to the professional" and the ordinary consumer. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999).

CGS's issuance procedures meet these standards. CGS requires requesters to submit basic information to, among other things, guard against the incorrect issuance of financial identifiers. In this instance, when faced with the irregularities that raised red flags concerning GIFDA's application, CGS proposed, as a potential alternative solution, that a recognized underwriter submit the CUSIP application. *See* Kim Decl. ¶ 20. When GIFDA could not secure an underwriter, even though it repeatedly said it could, CGS declined to issue CUSIPs. While the Court need not reach these questions to decide this motion, CGS's conduct was reasonable and a legitimate exercise of its discretion. *See supra* Background §§ A, D-E.

## II.    GIFDA Has Not Suffered Irreparable Harm.

GIFDA's motion for a mandatory injunction should fail for another reason—GIFDA cannot demonstrate irreparable harm. This failure is apparent from the following. *First*, this dispute, according to GIFDA, has been ripe for "nearly four years[,]" yet GIFDA has not sought relief until now. MOL ¶ 103. That warrants dismissal because a "significant delay in requesting relief contradicts the claim that the harm is immediate." *Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, 2022 U.S. Dist. LEXIS 64999, at *21 (M.D. Pa. Apr. 7, 2022).

*Second*, the alleged conduct at issue, a loss of business from "being excluded entirely from U.S. capital markets" (MOL ¶ 103), can be remedied without a mandatory injunction. *See Adams*, 204 F.3d at 484-85 (injuries that are "purely

17

economic in nature," such as "a loss of income alone" from losing a business opportunity, are "compensable in money" and not irreparable) (quoting *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). Put differently, "financial distress" can be remedied by monetary damages. *Id.*; *see also Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988) (loss of business opportunities not irreparable); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-02 (3d Cir. 1989) (exclusion from line of business alone insufficient to show irreparable harm).

This backdrop supports two conclusions that are inconsistent with irreparable harm, let alone an emergency supporting the extraordinary remedy of a mandatory injunction. First, there is no emergency. Second, GIFDA faces nothing close to an existential threat for failing to receive some (but not all) CUSIPs it requested.

GIFDA's remaining irreparable harm arguments fare no better. GIFDA's attempt to "convert monetary harm into irreparable harm simply by claiming" that lacking CUSIPs "will harm the plaintiff's reputation" does not support imposing an injunction. *See Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 178-79 (3d Cir. 2008) (holding that no irreparable harm exists where the plaintiff simply claims a breach of contract "prevented it from performing contracts with others and that this subsequent failure to perform will harm the plaintiff's reputation") (citing *Frank's GMC*, 847 F.2d at 102). Moreover, alleged job losses

18

and effects on states' infrastructure projects (MOL ¶ 106) are, at best, speculative injuries that belong to the relevant states, not GIFDA. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (movant seeking a preliminary injunction must establish that "*he* [the movant] is likely to suffer irreparable harm" (emphasis added)).

GIFDA's own cases undermine its argument. For example, GIFDA claims that certain violations of Section 2 are "per se" irreparable. MOL at 51. Yet GIFDA does not cite a single authority supporting this proposition. Its only case is *Hecht Co. v. Bowles*, an entirely inapplicable wartime emergency price controls case in which the Supreme Court *reversed* a finding for a preliminary injunction because it found the specific statute at issue there did not require an injunction. 321 U.S. 321, 322, 329-31 (1944). GIFDA's position of "per se" irreparable harm is further contradicted by *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, in which an injunction requiring AT&T to interconnect with MCI was vacated, even when that duty was explicitly required by a regulatory authority. 496 F.2d 214, 224 (3d Cir. 1974); *cf. MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1146 n.98, 1174 (7th Cir. 1983) (in "essential facilities" case, remanding to calculate monetary damages for alleged exclusion). And in *ECRI v. McGraw-Hill, Inc.*, the court reversed the grant of a preliminary injunction, specifically because the movant's injuries (as here) were compensable by monetary damages. 809 F.2d 223, 226-27 (3d Cir. 1987).

19

Further, CGS has provided GIFDA with a potential compromise solution to remedy its applications for certain CUSIPs—having a recognized underwriter or placement agent submit the application. Kim Decl. ¶ 20; Faulkner Decl. ¶ 56. That GIFDA could easily remedy its deficient applications without judicial intervention reinforces the conclusion that irreparable harm is absent here. *See Johnson v. Guhl*, 91 F. Supp. 2d 754, 777 (D.N.J. 2000) (no irreparable harm where plaintiffs could have sought relief instead by filing a petition because "[i]f Plaintiffs truly believed that irreparable injury would result from Defendants' failure to have implemented official regulations . . . the remedy available to Plaintiffs under [a different statute] was available during the [previous] six years[.]"). Thus, GIFDA's motion for a mandatory injunction should be denied.

## III.   The Balance of Equities and Public Interest Tip Against a Mandatory Injunction.

Because the threshold factors of likelihood of success on the merits and irreparable harm are not met, the Court need not evaluate the remaining factors. *Elad*, 160 F.4th at 412. Nonetheless, should the Court reach these questions, neither the balance of the equities nor the public interest favors GIFDA. Granting an injunction would chill CGS's lawful review procedures and compromise its ability to implement basic controls that prevent the issuance of CUSIPs that do not meet standard criteria. *See* Faulkner Decl. ¶ 14. Granting this unfounded and ill-defined

20

injunction could lead future aggrieved requesters to undermine the CUSIP issuance process under the guise of the antitrust laws.

Similarly, GIFDA cannot tether its sought relief to the needs of the states or federal government. MOL ¶ 117-20; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (harm to opposing party and public interest "merge when the Government," not a private company, "is the opposing party"). Neither the states nor the federal government have sued CGS based on these facts. GIFDA has not even offered evidence that any state or federal entity has approved these debt issuances. *Supra* Background § E. These sovereigns are free to pick a different issuer given that none appears to have been selected in the first instance.

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be denied.

Respectfully submitted,

Dated: April 7, 2026

/s/ *Douglas F. Johnson*
Douglas F. Johnson (PA #40036)
Charles P. Montgomery (PA #309822)
EARP COHN P.C.
121 South Broad Street, Suite 1720
Philadelphia, PA 19107
(215) 963-9520
djohnson@earpcohn.com
cmontgomery@earpcohn.com

/s/ *James Kovacs*
James Kovacs (DC 1046777) (*pro hac vice*)

21

J. Wyatt Fore (VA 89168) (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
600 14th Street NW, 5th Fl.
Washington, DC 20005
Phone: (646) 960-8612
james@scl-llp.com
wyatt@scl-llp.com

Jeffrey I. Shinder (NY 2633196) (*pro hac
vice* forthcoming)
Michael E. Keramidas (PA 331704)*
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Fl. 19
New York, NY 10122
Phone: (646) 960-8637
jeffrey@scl-llp.com
mkeramidas@scl-llp.com
*\*Admitted to practice in Pennsylvania. Not
admitted in New York.*

*Attorneys for Defendants CUSIP Global
Services and FactSet Research Systems Inc.*

22

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Local Rule 7.8(b)(2), I certify that Defendants' Opposition to Motion for Preliminary Injunction is 4,971 words using Microsoft Word's word count feature.

By: <u>*/s/ Michael E. Keramidas*</u>
Michael E. Keramidas